# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### SEPTEMBER 12, 2000 SESSION

## STATE OF TENNESSEE v.  GILFORD E. WILLIAMS

**Direct Appeal from the Circuit Court for Madison County**
**No. 98-93   Franklin Murchison, Judge**

---

**No. W1999-01556-CCA-R3-CD - Filed January 17, 2001**

---

The defendant, Gilford E. Williams, was convicted of one count of vehicular homicide.  The trial court imposed a Range I sentence of five years.  In this appeal of right, the defendant claims an entitlement to a new trial because the state violated the rules of discovery and the trial court erroneously admitted a photograph of the victim into evidence.  Because there was no reversible error, the judgment is affirmed.

**Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed.**

GARY R. WADE, P.J., delivered the opinion of the court.  DAVID G. HAYES, J., filed a concurring opinion in which THOMAS T. WOODALL, J., joined.

Patrick F. Martin, Jackson, Tennessee, for the appellant, Gilford E. Williams.

Paul G. Summers, Attorney General & Reporter; Mark E. Davidson, Assistant Attorney General; Don Allen, Christopher J. Schultz, and Shaun A. Brown, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

Shortly after 10:00 A.M. on July 15, 1997, the defendant, a commercial truck driver for J&J Trucking in Jackson, was driving toward Milan on the 45 Bypass to pick up a trailer in preparation for a trip to Burlington, Iowa.  As he approached a red light at an intersection with Channingway, the defendant was unable to stop his truck and struck a vehicle driven by the victim, Jo Ann Diffie, who was attempting to cross the 45 Bypass through a green traffic signal.  The defendant's truck collided with the driver's side of the victim's car, causing the victim to suffer head injuries which resulted in death.  There were several witnesses to the collision who testified that the defendant did not stop at the red traffic signal.

Lorie McCaskill, who had driven her vehicle through the intersection just ahead of the car operated by the victim, testified that she saw the defendant's truck, accelerated her car, and then, after having safely moved through the green light, heard "a tremendously loud noise."  When Ms.

McCaskill returned to the accident scene, she heard the defendant say, "I saw the light turn red, but I just couldn't stop."

Keith Slaman, the driver of a vehicle behind and to the side of that driven by the victim, testified that he was entering the intersection through a green light when the victim's car was struck by an 18-wheeler tractor. Slaman recalled hearing the screeching of tires just before the impact and observed black marks on the pavement immediately after the accident. Debra Winsett and Betty Flowers, who were inside their respective vehicles at the intersection at the time of the accident, testified that the defendant's truck drove through a red light. Ms. Winsett testified that the truck was operating at a normal speed and Ms. Flowers estimated the speed of the defendant's truck to be 40 to 45 miles per hour.

Jackson Police Officer Peaches Nesbitt performed cardiopulmonary resuscitation on the victim until paramedics arrived. Officer Nesbitt spoke with the defendant and recalled his saying that he tried to stop his truck but could not. Ken Haney, a patrolman with the Jackson Police Department, also heard the defendant say that he tried to stop but could not. Officer Haney, who testified that the speed limit on the 45 Bypass at its intersection with Channingway was 45 miles per hour due to construction, observed skid marks in the northbound lanes of the 45 Bypass "prior to entering the intersection" with Channingway.

James Robinson, an employee of the Tennessee Commercial Vehicle Department, testified that he inspected the defendant's truck for over one and one-half hours. He determined that both the left and right steering brakes, or front brakes, were inoperable, but that the four tandem brakes, all of which were located behind the steering axle, were within normal adjustment limits. Robinson cited the defendant for faulty steering brakes and recalled that the defendant appeared to be surprised when he was informed that the steering brakes were inoperable.

Officer Randy Urig, an accident reconstructionist with the Jackson Police Department, estimated that the defendant was traveling 59 miles per hour when the brakes of his truck locked. It was his opinion that the truck was traveling 40 miles per hour at the time of impact. Officer Urig testified that the skid marks he found were left by both the rear dual tires and the front tires of the defendant's truck. It was his opinion that the defendant would have been traveling at a speed of only 14 miles an hour at the time of impact if he had been traveling at the posted speed of 45 miles per hour when he locked his brakes. It was Officer Urig's opinion that the skid marks left by the front tires established that the front brakes were at least partially operable just before the accident. It was his belief that the front brakes failed mechanically at the point of impact due to force.

The defendant testified in his own behalf. According to the defendant, the truck that he regularly drove had a rear bearing out and was "in the shop." He recalled that after receiving his assignment, he learned from the shop that they had a different truck for him to drive. Upon his arrival, the mechanic said, "Everything is fine on the truck. I checked it out. It's – The truck is ready to go." The defendant testified that he got on I-40 after leaving the shop, then exited onto the 45 Bypass. He stated that as he approached the intersection of the 45 Bypass and Channingway, he

downshifted and pressed his brakes, which felt "spongy," at which point he knew that his truck would not stop. The defendant claimed that "[i]t felt like [the truck] was on ice" and stated that he "slid through the light." The defendant acknowledged that the light was red. He estimated his speed at between 45 and 50 miles per hour after he had downshifted the gears as he approached the intersection. While acknowledging that he did not conduct a pre-trip inspection of his truck, the defendant contended that the brakes worked fine when he stopped at a stop sign immediately after picking up the truck. He acknowledged that his truck had no trailer and, therefore, had less traction and took longer to stop than it would have had he been hauling freight. The defendant also confirmed that the brakes on the rear wheels responded to his efforts to stop.

William F. New, Sr., an automobile mechanic, reviewed the report by Officer Robinson. It was New's opinion that inoperative front brakes on the defendant's truck would result in a 25% loss of braking capability. It was his opinion that the only thing that could cause brakes to become inoperative due to impact would be a broken or ruptured brake line causing an air or fluid leak.

Bobby Gene Replogle, a retired truck driver with 30 years experience, testified that it was not customary for there to be a check of the brake pads as part of a pre-trip inspection. It was his opinion that the downshifting of one gear in a truck like the defendant's would result in a reduction in speed of eight to ten miles per hour.

The defendant initially complains that the state failed to reveal prior to trial that it was Officer Urig's opinion that the front brakes of the truck were operable until the time of impact. The defendant asserts that the application of Rule 16(a)(1)(D) of the Tennessee Rules of Criminal Procedure in conjunction with the open file discovery policy employed by the prosecution should preclude the district attorney general from providing technically correct, but nevertheless incomplete or misleading information during discovery. Officer Urig's report, which was contained in the open file of the district attorney, but was not made a part of this record, did not include any information about whether the front brakes were operable. It is undisputed, however, that the state was unaware that Officer Urig would testify that the front brakes were at least partially operable. At trial, an assistant district attorney stated as follows:

> I have nothing in any of the reports I have that suggests from Officer Urig that that is his opinion as to the operation of the front brakes . . . until it came from the [witness stand], . . . I had no reason to expect [the testimony and] I never thought to ask that question of Officer Urig.

The defendant submits that when the district attorney general relies upon an open file discovery policy, it should be the obligation of that office to use due diligence not only in locating and producing any reports, but also in providing complete information. The defendant also speculates that Officer Urig withheld this information in order to surprise the defense and that, in consequence, due process principles require a new trial. Rule 16 of the Tennessee Rules of Criminal Procedure provides in pertinent part as follows:

> Upon request of a defendant <u>the State shall permit the defendant to inspect</u> and copy or photograph <u>any results or reports of . . . scientific tests or experiments</u>, or copies thereof, which are within the possession, custody or control of the State, the existence of <u>which is known, or by the exercise of due diligence may become known, to the district attorney general and which are material to the preparation of the defense</u> or are intended for use by the State as evidence in chief at the trial.

Tenn. R. Crim. P. 16(a)(1)(D) (emphasis added).

Initially, the primary purpose of the criminal trial is to discover the truth. This goal can only be achieved by the avoidance of unnecessary surprise, through complete and reciprocal discovery. <u>See</u> <u>State v. Brown</u>, 552 S.W.2d 383, 386 (Tenn. 1977); <u>State v. Gaddis</u>, 530 S.W.2d 64, 69 (Tenn. 1975). It is perplexing for either side in any litigation to be faced with unanticipated testimony, expert or otherwise, on material issues.

The defendant relies upon the opinion of this court in <u>State v. Carol H. Dougherty</u>, No. 827 (Tenn. Crim. App., at Knoxville, Jan. 9, 1989). Dougherty, who had a blood alcohol content of .11%, was convicted of two counts of second degree murder based in great measure upon the testimony of a trooper with the Tennessee Highway Patrol, whom the state had not identified as an expert witness prior to trial. At trial, the state was allowed to qualify the trooper as an expert in accident reconstruction. It was his opinion that the defendant had been traveling 84 miles per hour at the time of impact. The district attorney maintained an open file policy. Prior to trial and in response to a discovery request, the state provided the defense with a list of expert witnesses. The list did not include the name of the trooper. The first indication that the state intended to use the witness for any purpose other than photograph identification was when the state offered evidence qualifying the trooper as an expert. Because the state had cause to believe that detailed testing had been performed by the trooper, who had provided notice to the district attorney general's office weeks in advance of trial that he had estimated the speed of the defendant's vehicle from his findings at the scene, this court held that Rule 16 required not only a disclosure of reports and test results which are known, but also those which, by the exercise of due diligence, could have become known to the district attorney general. This court described this obligation as continuing in nature. In <u>Dougherty</u>, the estimated speed of the vehicle was deemed to be critical to the issue of malice and the failure by the state to provide notice that the trooper was to be offered as an expert witness on that issue "more probably than not affected the judgment." <u>See</u> Tenn. R. App. P. 36(b). Absent evidence of malice, Dougherty could have been convicted only for vehicular homicide.

The case at issue can be distinguished from <u>Dougherty</u> on the facts. Initially, the defense was aware that Officer Urig was to be presented as an expert witness. The record, however, is unclear as to whether defense counsel took advantage of that knowledge and interviewed the officer prior to trial. In a hearing out of the presence of the jury during the trial, defense counsel first represented to the trial judge that he had not interviewed Officer Urig: "Everything was handed to us. There was

nothing to ask him." On two occasions during the motion for new trial, however, defense counsel indicated that he had, in fact, conducted an interview of the officer and specifically added that he had asked the officer, "Is this what you would be testifying to, the reconstruction report that you put together, your conversations with J[P]D officers about the traffic lights and how they operated on time or not?" On direct examination, the officer did testify that the front tires left skid marks on the pavement, allowing an inference that the brakes may have been operable. Nevertheless, the assistant district attorney general did not question Urig as to whether the front brakes were operational. During cross-examination, however, the following exchange took place:

Q. And [Officer Robinson] indicated by that ticket, did he not, that Mr. Williams' truck's brakes . . . were being cited as being totally inoperative in the front, both left and right?

A. Yes sir.

Q. With that information, did that mean anything to you in terms of this reconstruction?

A. Up to the point of impact the front brakes were working.

* * *

Q. And is that a determination you made, or is that a determination Mr. Robinson made?

A. . . . The front brakes as you've seen on this picture right here, . . . your outside tires are lighter. The inside tires are darker, meaning your front tires are covering over this, giving a darker impression.

Q. [I]s there some reason why your opinion was not in the report, that you saved that opinion for here today?

A. No, sir. No.

* * *

Q. And again, you're going by something you think are front tires that are showing some kind of braking capability between the point when you say he was doing 59 miles an hour and the point when he could have made the collision.

A. Yes, sir, where the vehicles collided.

-5-

\* \* \*

Q.      All you can tell by the skid mark is that in your opinion as a reconstructionist, some kind of braking capability on the front brakes apparently were operating until the point of collision.

A.      Until the point of collision, yes, sir.

Q.      All right, that could have been as little as ten percent. It could have been.

A.      Yes, sir, it could.

In State v. Dan Baron Reid, No. 16 (Tenn. Crim. App., at Jackson, July 30, 1986), a defendant convicted of vehicular homicide complained that the trial court erred by allowing two officers to testify regarding gouge marks on the road because "the measurements that they took at the scene" were not included in their accident report. This court denied relief:

> The appellant was well aware of who these officers were. One was the formal prosecutor on the indictment. The other's name appeared throughout the accident report. There is no indication that they were uncooperative or unwilling to share the benefits of their investigation with the appellant's counsel during the discovery process.

Slip op. at 6.

A similar result was reached in State v. Chico Lopez Chigano, No. 1333 (Tenn. Crim. App., at Knoxville, Sept. 26, 1991). Because the state provided FBI test results to the defense, informed defense counsel of the name of the testifying agent, and offered defense counsel the opportunity to discuss the test results with the testifying agent, as well as other physical evidence, this court found no bad faith on the part of the state and no denial of pretrial access to underlying ballistics testing information.

In our view, the state is not obliged to furnish the defense with information which is available to the defense or which could be obtained by the exercise of due diligence. See State v. Dickerson, 885 S.W.2d 90 (Tenn. Crim. App. 1993). Neither the state nor the defense was aware prior to trial that Officer Urig believed that the defendant's steering brakes were operable prior to the collision. That information was not included in Urig's report. The state's obligation under Tenn. R. Crim. P. 16 was to use due diligence in determining the existence of any "reports" of "scientific tests" or "experiments," and to produce those reports to the state. It is our opinion the state complied with this obligation. While Officer Urig's report did not contain information regarding his opinion that the defendant's front brakes were working prior to the accident, the record demonstrates that Officer Urig was called to testify as an expert regarding the speed of the defendant's truck at the time of the accident, not whether the defendant's brakes were working. Finally, while it is unclear whether

defense counsel actually interviewed Urig prior to trial, it is uncontradicted that Urig was available to the defense. Under such circumstances, some responsibility must be placed upon a defendant, with full knowledge that an expert will testify, to adequately investigate. Furthermore, the failure of the defendant to place Officer Urig's report in the record places us at a disadvantage for a full and fair review.

In the alternative, even if the state violated Tenn. R. Crim. P. 16, the error qualifies as harmless. As indicated, Urig was utilized as a witness primarily to establish the speed of the defendant's vehicle when the brakes were applied. The state had previously offered evidence through its first expert witness that the defendant's steering brakes were totally inoperable. Furthermore, because Officer Urig conceded that the front brakes, in his opinion, may have been working with as little as 10 percent of their capability, it is not likely that this particular evidence, important as it may have appeared, affected the verdict. In this instance, the burden is on the defense to establish that any error by the trial court in either allowing the evidence or refusing to grant a mistrial because of its admission more probably than not affected the verdict. The speed of the defendant's vehicle before braking as he drove through a construction zone, apparently in excess of the 45 miles per hour posted speed limit, was the more critical concern.

Next, the defendant insists that the trial court erred by allowing the state to introduce a photograph of the victim which was taken prior to the accident. The defendant complains that the formal, portrait-like photograph had no materiality to the issues. In context, the evidence was introduced through Officer Nesbitt, who identified the photograph as being of the person on whom she performed cardiopulmonary resuscitation. The officer, who later in her testimony produced a copy of the victim's death certificate, established that the victim had died as a result of the collision.

This issue is governed by Rule 403 of the Tennessee Rules of Evidence, which provides in pertinent part as follows:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . .

See also State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978). The admission of photographs is generally discretionary with the trial court and, absent an abuse of that discretion, will not result in the grant of a new trial. Dickerson, 885 S.W.2d at 92. In State v. Dicks, 615 S.W.2d 126, 128 (Tenn. 1981), our supreme court ruled that while pre-death pictures of a homicide victim should not have been admitted at trial when they were not relevant to a material issue, the error was unlikely to have affected the outcome of the trial. As indicated in State v. Strouth, 620 S.W.2d 467, 472 (Tenn. 1981), the error is almost always harmless. In our view, the admission of the photograph of the victim, taken while she was alive, did not affect the results of the trial.

Accordingly, the judgment is affirmed.

_____
GARY R. WADE, PRESIDING JUDGE